# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DIANA SLEIS and STEFAN SCHWING  : 
       Plaintiffs,         :        Civil Action No. 3: 04CV1464 (CFD)
                          : 
v.                           : 
                          : 
KENYON OIL d/b/a X-TRA MART and   : 
WALTER KELLY              : 
       Defendants.        : 

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Diana Sleis, brought this action against Sleis's former employer, Kenyon

Oil d/b/a X-Tra Mart ("Kenyon Oil") and her supervisor Walter Kelly for pregnancy

discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e,

*et seq*.[1]  Sleis also asserts state claims for intentional infliction of emotional distress, and

negligent infliction of emotional distress.  Sleis claims that Kenyon Oil discriminated against her

on the basis of pregnancy by requiring her to work excessive hours, and then discharging her

when she complained about her hours.  Pending is the defendant's motion for summary

judgment.

**I**      **Background**[2]

In September 2001, Kenyon Oil hired Sleis as a management trainee for its chain of gas

---

[1] Stefan Schwing is now Sleis's husband and was her boyfriend at the time of the events described in the complaint.

[2] The facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties.  They are undisputed unless otherwise indicated.

station convenience marts.  On September 20, 2001, Sleis completed her training, and on October 25, 2001 she became the manager of Kenyon Oil's Route 66 Hebron location (the "Hebron store").

In this position, Sleis reported to Walter Kelly, a supervisor who oversaw operations at several Kenyon Oil stores.  Kenyon Oil expected its management-trainees to work at least forty hours per week, and expected its managers to work at least fifty hours per week.

Shortly after becoming manager of the Hebron store, Sleis learned that she was pregnant and on about November 4, 2007, she informed Kelly of her pregnancy.  In early November, Sleis had been pregnant for at most a few weeks.[3]

It is undisputed that Sleis worked many hours at the Hebron store each week.  The chart at the end of this section summarizes the hours she worked throughout her employment at Kenyon Oil.[4]  According to Sleis's deposition testimony, she had "no complaints" with the hours she worked prior to November 21, 2001.

As soon as Sleis became manager of the Hebron store, she immediately began to have "problems" with the store's assistant manager, Debbie Sherman.  According to Sleis's deposition testimony, Sherman used vulgarity in conversation with Sleis and other employees.  Sleis also felt as though she and Sherman were in a "power struggle."  During her first week at the Hebron store, Sleis complained to Kelly about her problems with Sherman.  Kelly suggested that the problems were because Sherman needed time to adjust to having a new manager, and urged Sleis

_____

[3] Sleis's baby was born July 16, 2002.

[4] According to Sleis's deposition testimony, her timesheets were not an accurate record of the hours she worked because she would come in to the Hebron store without recording her presence.  However, Sleis presented no other evidence about the hours she worked.

to be patient.

However, according to Sleis, the problems between her and Sherman only worsened. Finally, the morning of November 21ˢᵗ, Sleis and Sherman had a substantial confrontation. According to Sleis, Sherman "threw a fit" in the presence of a delivery person and used profanity. After the incident, Sleis was no longer willing to tolerate working with Sherman and filled out paperwork to terminate Sherman's employment. When Sleis complained about Sherman and gave Kelly Sherman's termination paperwork, Kelly investigated Sleis's accusations, but refused to terminate Sherman. None of the employees Kelly contacted knew about the argument. Instead of terminating Sherman, Sherman was transferred to a different Kenyon Oil store.

Sleis hoped that one of the cashiers in the Hebron store would be promoted to replace Sherman, but Kelly refused to promote Sleis's candidate. Instead Kelly advertised that there was an opening at the store. However, Kelly never received any employment applications in response to the advertisements. According to Sleis, she had to work longer hours because of the vacant assistant manager position, and repeatedly complained to Kelly, and his supervisor, that she needed more support. In response to Sleis's complaints that she needed an assistant manager, Kelly offered to return Sherman to the Hebron store, but Sleis refused to work with Sherman again.

On the morning of December 12, 2001, Sleis left Kelly a phone message mentioning that she was concerned that her work schedule might endanger her baby and agreeing to have Sherman return to the Hebron store as long as they did not work the same shifts. That same morning Sleis left the Hebron store for her doctor's office. There, Sleis obtained a note

3

indicating that she should work fewer hours because of her pregnancy. Also on December 12, 2001, Sleis mailed a note informing Kelly that she had contacted the CHRO about her workload.

When Sleis returned to the store, Sleis was frustrated with her work schedule and again called to speak with Kelly about it. Kelly did not answer her call; so Sleis left a voice-mail message. According to a transcript of the message prepared by Kenyon Oil, Sleis complained about Sherman, Kelly's failure to find a replacement for her, and Sleis's hours. The message was laced with vulgarity. In closing, Sleis said "you get her [a new assistant manager] in this fucking store or I'm walking out. . . today. . . no one's going to be behind the register."

After Kelly heard the message, he contacted Kenyon Oil's security department. Kelly, together with a Kenyon Oil security officer, immediately went to the Hebron Store and discharged Sleis.[5] According to Kelly, he discharged Sleis for being insubordinate, and for threatening to leave the store unstaffed.

It was only after her discharge that Sleis provided Kenyon Oil with the doctor's note indicating that she should work fewer hours. Sleis also claims that on December 11 or 12, she contacted the Connecticut Commission of Human Rights and Opportunities ("CHRO") to complain about her treatment at Kenyon Oil. However, Kenyon Oil (and Kelly) did not learn about the CHRO complaint until after Sleis was discharged.[6]

_____

[5] Kelly also brought Sherman with him to run the store following Sleis's discharge.

[6] The Court notes that Sleis's affidavit indicates that "there is a record of the message that I left Walter Kelly on December 11, 2001 that clearly details that I called the CHRO on that day. This record . . . was produced in discovery. In fact, I was questioned about this in my deposition." However, Sleis's deposition testimony, and other evidence presented along with the motion for summary judgment, directly contradicts these assertions: Sleis's deposition testimony indicates that the voice message she left for Kelly was on December 12, 2001 and not December 11 and refutes the assertion that Sleis told Kelly before she was discharged that she had contacted

| Nature of Work | | Week Ending | Hours |
|---|---|---|---|
| Trainee | | September 19, 2001 | 44 |
| Assistant Manager at East Hampton Road store.<br>Average: 51.4 hours | | September 26, 2001 | 56 |
| | | October 3, 2001 | 61.25 |
| | | October 10, 2001 | 42 |
| | | October 17, 2001 | 48.25 |
| | | October 24, 2001 | 49.5 |
| Manager at Hebron store. (Kelly unaware of Sleis's pregnancy.) Average: 58.33 hours | | November 1, 2001 | 57.5 |
| | | November 2-3 (half week) | 30 |
| Manager at Hebron store. (Kelly aware of Sleis's pregnancy.)<br>Average: 61.09 hours | Sherman working at Hebron store. Average: 59.6 hours | November 4-7, 2001 (half week) | 39 |
| | | November 14, 2001 | 42 |
| | | November 21, 2001 | 68 |
| | No assistant manager at Hebron store. Average: 62.33 hours | November 28, 2001 | 68 |
| | | December 5, 2001 | 67 |
| | | December 12, 2001 | 52 |

## II  Summary Judgment Standard

        In a summary judgment motion, the burden is on the moving party to establish that there

---

the CHRO.  During her deposition, Sleis was asked "Neither of the messages that you left on the 12th make reference to a CHRO complaint, do they?" and she responded "No."  Further, the "record" of Sleis's phone message does not mention the CHRO.  " '[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.' " Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir.1995).  Thus, if Sleis intended to raise a Title VII retaliation claim in her amended complaint, it would fail because she has not presented evidence that Kenyon Oil knew that she had contacted the CHRO at the time of her discharge.

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A court

must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.

5(c)); accord Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993).  A dispute regarding a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  Anderson, 477 U.S. at 248.

Where, as in this case, the nonmoving party has the burden of proof at trial, the moving

party need only demonstrate that there is a lack of evidence to support the nonmovant's claim.

Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir.

1998).  Once the movant has established a prima facie case demonstrating the lack of a genuine

issue of material fact, the nonmoving party must provide enough evidence to support a jury

verdict in its favor.  Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.

1991).  A plaintiff may not rely on conclusory statements or mere contentions that the evidence

in support of summary judgment is not credible.  Ying Jing Gan v. City of New York, 996 F.2d

522, 532 (2d Cir. 1993).  Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere

allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material

fact.  Fed. R. Civ. P. 56(e).  Therefore, after discovery, if the nonmoving party "has failed to

make a sufficient showing on an essential element of [its] case with respect to which [it] has the

burden of proof," then summary judgment is appropriate.  Celotex, 477 U.S. at 323.  When

addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all

inferences in favor of the nonmoving party in order to determine how a reasonable jury would

decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly

when reasonable minds could not differ as to the import of the evidence is summary judgment

proper." Maffucci, 923 F.2d at 982.

## III.  Discussion

Without conceding that Sleis established a prima facie case of pregnancy-discrimination,

Kenyon Oil moves for summary judgment on the ground that Sleis cannot establish that the

reasons for her discharge were a pretext for discrimination.

### A.  Pregnancy Discrimination[7]

To establish a prima facie case of pregnancy discrimination a plaintiff must show "1) that

[s]he belonged to a protected class; 2) that [s]he was qualified for the position [s]he held; 3) that

[s]he suffered an adverse employment action; and 4) that the adverse employment action

occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v.

New York, 366 F.3d at 152 (citing Collins v. New York City Transit Auth., 305 F.3d 113, 118

(2d Cir. 2002)); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) (applying "the

three-step burden shifting analysis of McDonnell Douglas" to pregnancy disparate treatment

claim). "An 'adverse employment action' is one which is 'more disruptive than a mere

inconvenience or an alteration of job responsibilities.'" Id. (quoting Galabya v. New York City

Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000)). Once a plaintiff has established a prima facie

---

[7] Sleis's amended complaint also refers to 42 U.S.C. § 1981, which protects against race-based discrimination (see, e.g., Albert v. Carovano, 851 F.2d 561 (2d Cir. 1988) (noting "racial character of the rights being protected" by § 1981)), and 42 U.S.C. § 2003, which empowers the Secretary of Health and Human Services to make regulations for the operation of certain health facilities. These provisions are inapplicable to the allegations made in Sleis's complaint.

case, the defendant must then articulate a legitimate reason for the adverse employment action. See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). Once a defendants does so, the plaintiff must show that the proffered reason is pretextual, and that the real reason for the discharge was discrimination. See id.

Sleis has established that she belonged to a protected class and was at least arguably qualified for the position she held. Sleis maintains that she suffered two adverse employment actions: First, Sleis seems to argue that the long hours she worked after notifying Kelly that she was pregnant constitute an adverse employment action. Second, Sleis argues that her discharge was an adverse employment action.

The Court finds that, under the circumstances of this case, Sleis's work schedule in November and December of 2001 cannot constitute an adverse employment action. "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Feingold v. New York, 366 F.3d at 152 (internal quotation marks and alterations omitted) (holding that discriminatory workload could constitute adverse employment action). Sleis certainly worked long hours at the Hebron store: in the week and half before she claims to have told Kelly about her pregnancy Sleis worked an average of 58.33 hours per week; in the six weeks after Kelly allegedly learned of her pregnancy Sleis worked an average of 61.09 hours per week. However, Sleis's hours did not change materially after she told Kelly about her

pregnancy, and thus did not constitute an adverse job action.[8]

Conversely, Sleis's discharge was clearly an adverse employment action. Sleis argues that her discharge was caused by pregnancy-based discrimination because other non-pregnant Kenyon Oil employees were not discharged for using vulgarity in the work place. In particular, Sherman was not discharged for the incident involving her and Sleis on November 21.

However, even if Sherman's situation was sufficiently comparable to Sleis's to support a prima facie case of pregnancy-based discrimination, it is not sufficiently comparable to suggest that Kenyon Oil's stated reasons for discharging Sleis were pretext.[9] Whether comparators are similarly situated for Title VII purposes "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir.1999)

_____

[8] Further, the Court notes that it is unclear whether Sleis's long hours were attributable to any conscious decision by Kelly. According to Sleis, she had "no complaints" about the hours she worked prior to Sherman's departure, and was only upset that Kelly did not act more quickly to compensate for Sherman's absence from the Hebron store. However, Sleis's average weekly hours worked only increased by 2.7 after Sherman's transfer. Thus, Sleis's work schedule was not an "employment action."

In addition, Sleis has not presented evidence creating an inference that her workload was attributable to discrimination. Sleis has not presented work schedules of non-pregnant managers at comparable stores, nor does her own work schedule prior to her pregnancy provide a meaningful comparison. Finally, Kelly's marginal and passive role in "causing" Sleis's workload suggests that her workload was not discriminatory.

[9] Another factor which might support an inference of pregnancy-based discrimination for purposes of establishing a prima facie case is that Sleis referred to her pregnancy in the first voice message she left for Kelly on December 12th, the day she was discharged. However, any inference derived from the temporal proximity of this reference and Sleis's discharge is weak, because, according to Sleis, Kelly had known about her pregnancy for over a month. Certainly, this proximity is insufficient to suggest that Kenyon Oil's stated reason for discharging Sleis was pretext. Also, as stated in the text, the only credible evidence submitted to the Court indicates that Kelly was not aware of the December 12 doctor's note or the CHRO complaint at the time he discharged Sleis.

9

(explaining that "[r]easonableness is the touchstone" and recognizing that "the plaintiff's case and the comparison cases ... need not be perfect replicas")). Relevant factors include "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham v. Long Island R.R., 230 F.3d at 40. "The determination that two acts are of comparable seriousness requires-in addition to an examination of the acts-an examination of the context and surrounding circumstances in which those acts are evaluated." Graham v. Long Island R.R., 230 F.3d at 40; Mutts v. Southern CT State University, No. 3:04-CV-1104 (CFD), 2007 WL 2688871, at *5 (D. Conn. Sept. 12, 2007) (noting that context is particularly important in attempting to compare incidents of "'disruptive' or 'inappropriate' workplace conduct"). While both Sleis and Sherman directed extreme vulgarity at a supervisor, Sleis also threatened to walk out of the store she managed, leaving it unattended. Accordingly, while Sherman behaved inappropriately and was disrespectful to a supervisor, Sleis's conduct directly called into question her reliability as a store manager. Thus, Sleis and Sherman were not similarly situated and summary judgment is granted on Sleis's pregnancy-discrimination claims.[10]

**D.     State Law Claims**

As a result of the Court's rulings on Sleis's pregnancy discrimination claims, she is left

---

[10] Summary judgment must also be granted on Sleis's claim against Kelly because "under Title VII individual supervisors are not subject to liability." Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003) (affirming dismissal of plaintiff's Title VII claims against defendant in his personal capacity).

with three state-law emotional distress tort claims.[11]  While it is true that the Court may exercise

supplemental jurisdiction over Sleis's state-law claims under 28 U.S.C. § 1367, the Second

Circuit has advised district courts that "'in the usual case in which all federal-law claims are

eliminated before trial, the balance of factors to be considered under the [supplemental]

jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward

declining to exercise jurisdiction over the remaining state-law claims.'" Valencia ex rel. Franco

v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S.

343, 350 n. 7 (1988). This is the "usual case" envisioned in Valencia. All that remains in this case

is three state law claims.  Therefore, in the interests of judicial economy, convenience, fairness,

and comity, the Court declines to exercise supplemental jurisdiction over Counts Three through

Five.

## IV.    Conclusion

The motion for summary judgment **[Doc. # 42]** is **GRANTED**, and judgment is entered

for the defendant.  The clerk is ordered to close this case.

SO ORDERED this   28th   day of September 2007, at Hartford, Connecticut.


  /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[11] While it appears that Schwing withdrew his single loss of consortium claim, the second amended complaint is somewhat ambiguous.  To the extent that Schwing intended to preserve his loss of consortium claim, the Court declines to exercise jurisdiction over this claim for the reasons expressed in text below.